# United States Court of Appeals for the Federal Circuit

05-1058

ZHEJIANG NATIVE PRODUCE & ANIMAL BY-PRODUCTS IMPORT & EXPORT CORP., KUNSHAN FOREIGN TRADE CO., CHINA (TUSHU) SUPER FOOD IMPORT & EXPORT CORP., HIGH HOPE INTERNATIONAL GROUP JIANGSU FOODSTUFFS IMPORT & EXPORT CORP., NATIONAL HONEY PACKERS & DEALERS ASSOCIATION (NHPDA), ALFRED L. WOLFF, INC., C.M. GOETTSCHE & CO., CHINA PRODUCTS NORTH AMERICA, INC., D.F. INTERNATIONAL (USA) INC., EVERGREEN COYLE GROUP, INC., EVERGREEN PRODUCE, INC., PURE SWEET HONEY FARM, INC., and SUNLAND INTERNATIONAL, INC.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

SIOUX HONEY ASSOCIATION and
AMERICAN HONEY PRODUCERS ASSOCIATION,

Defendants.

Ned H. Marshak, Grunfield, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, New York, argued for plaintiff-appellant. With him on the brief were Bruce M. Mitchell; and Mark E. Pardo, of Washington, DC. Of counsel were Jeffrey S. Grimson, of Washington, DC and Adam M. Dambrov, of New York, New York.

Reginald T. Blades, Jr., Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General and David M. Cohen, Director. Of counsel on the brief was William J. Kovatch, Jr., Attorney, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC. Of counsel were Robert LaFrankie, Berniece Browne and John D. McInerny, Attorneys.

Appealed from: United States Court of International Trade

Judge Richard K. Eaton

# United States Court of Appeals for the Federal Circuit

05-1058

ZHEJIANG NATIVE PRODUCE & ANIMAL BY-PRODUCTS IMPORT & EXPORT CORP.,
KUNSHAN FOREIGN TRADE CO.,
CHINA (TUSHU) SUPER FOOD IMPORT & EXPORT CORP.,
HIGH HOPE INTERNATIONAL GROUP
JIANGSU FOODSTUFFS IMPORT & EXPORT CORP.,
NATIONAL HONEY PACKERS & DEALERS ASSOCIATION (NHPDA),
ALFRED L. WOLFF, INC., C.M. GOETTSCHE & CO.,
CHINA PRODUCTS NORTH AMERICA, INC., D.F. INTERNATIONAL (USA) INC.,
EVERGREEN COYLE GROUP, INC., EVERGREEN PRODUCE, INC.,
PURE SWEET HONEY FARM, INC., and SUNLAND INTERNATIONAL, INC.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

SIOUX HONEY ASSOCIATION and
AMERICAN HONEY PRODUCERS ASSOCIATION,

Defendants.

_____

DECIDED:  December 20, 2005
_____


Before NEWMAN, Circuit Judge, ARCHER, Senior Circuit Judge, and RADER, Circuit Judge.

NEWMAN, Circuit Judge.


Zhejiang Native Produce & Animal By-Products Import & Export Corporation and

other importers and exporters (collectively "Zhejiang") appeal the decision of the United

States Court of International Trade, holding that "critical circumstances," 19 U.S.C. §1673(a)(3), apply to certain importations of honey from the People's Republic of China.[1] We reverse the decision and remand for further proceedings.

ANALYSIS

In 1995 the governments of the People's Republic of China and the United States entered into an agreement suspending an antidumping investigation of honey imported from China, initiated as reported at Initiation of Antidumping Duty Investigation: Honey from the People's Republic of China, 59 Fed. Reg. 54434 (Oct. 31, 1994). The Suspension Agreement was signed for the United States by the Assistant Secretary of Commerce for Import Administration and by the Minister-Councillor of the Embassy of the People's Republic of China. The Agreement stated its purpose as follows:

> For the purpose of encouraging free and fair trade in honey, establishing more normal market relations, and preventing the suppression or undercutting of price levels of the domestic product, the United States Department of Commerce ("the Department") and the Government of the People's Republic of China ("PRC") enter into this suspension agreement ("the Agreement").

Notice of Agreement, Honey from the People's Republic of China: Suspension of Investigation, 60 Fed. Reg. 42522 (Aug. 16, 1995). The Agreement required that honey from China would be imported at a price of at least 92% of the weighted average price of all imported honey from all other countries for the most recent six months of data, and set quantity limits. The Notice stated that the Agreement complied with "the criteria for

---

1   Zhejiang Native Produce & Animal By-Products Import & Export Corp. v. United States, No. 02-00057, 25 ITRD (BNA) 2394 (Ct. Int'l Tr. Nov. 21, 2003); 26 ITRD (BNA) 2320 (Ct. Int'l Tr. Aug. 26, 2004).

suspension of an investigation pursuant to Section 734(l) of the Tariff Act of 1930, as amended." Id. Such criteria include the complete elimination of sales at less than fair value:

> 19 U.S.C. §1673c(b). <u>Agreements to eliminate completely sales at less than fair value or to cease exports of merchandise</u>
> The administering authority may suspend an investigation if the exporters of the subject merchandise who account for substantially all of the imports of that merchandise agree --
> . . . .
> (2)　　to revise their prices to eliminate completely any amount by which the normal value of the merchandise which is the subject of the agreement exceeds the export price (or the constructed export price) of that merchandise.

The Suspension Agreement by its terms expired on August 16, 2000. On September 29, 2000 the American Honey Producers Association and the Sioux Honey Association filed with the Department of Commerce a petition asserting dumping of honey from China. The petition cited a price quotation obtained on August 17, 2000 for Chinese honey, a price apparently not significantly different from import prices before expiration of the Agreement. The petition proposed that India be used as a free-market surrogate for China in accordance with 19 U.S.C. §1677b(c), and provided data that were asserted to show that the price quotation for Chinese honey was at less than fair value. The Department of Commerce initiated an antidumping investigation. <u>See</u> <u>Initiation of Antidumping Duty Investigations: Honey from Argentina and the People's Republic of China</u>, 65 Fed. Reg. 65831 (Nov. 30, 2000).

The Department of Commerce then conducted a cost and pricing investigation for India as a free-market surrogate for China, using data from publications and from Indian honey producers, for the period January 1, 2000 through June 30, 2000. Referring to the

05-1058　　　　　　　　　　　　　　　　　3

price quotations for Chinese honey imported under the Suspension Agreement and following its expiration, Commerce concluded that these prices were at less than fair value when compared with the data for India. Notice of Preliminary Determination of Sales at Less Than Fair Value: Honey from the People's Republic of China, 66 Fed. Reg. 24101 (May 11, 2001); Amended Preliminary Determination, 66 Fed. Reg. 40191 (Aug. 2, 2001); Final Determination, 66 Fed. Reg. 50608, 50609 (Oct. 4, 2001); Amended Final Determination, 66 Fed. Reg. 63670 (Dec. 10, 2001). Dumping margins ranging from 25.88% to 183.80% were found.

The petitioners also asserted that "critical circumstances" existed. Critical circumstances are defined in 19 U.S.C. §1673d(a)(3) as when:

> (A)(ii) the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the subject merchandise at less than its fair value and that there would be material injury by reason of such sales, and
> (B) there have been massive imports of the subject merchandise over a relatively short period.

If the criteria for critical circumstances are met, then antidumping duties are made effective 90 days earlier than the effective date of antidumping duties in the absence of critical circumstances. The foundation of this enlarged imposition of antidumping duties is, as the statute states, that the importer "knew or should have known" that the price was below fair value and would materially injure domestic industry, and that there were "massive imports" at dumping prices. See generally Joseph E. Patterson, 1 Antidumping and Countervailing Duty Laws §3:11.

The statute does not state how "knew or should have known" is determined. Commerce has adopted the general practice of imputing such knowledge whenever the

dumping margin is greater than 25%, without requiring evidence of actual knowledge. Applying this imputation, Commerce held that critical circumstances existed for the four respondents whose imports were of the largest volume, and retrospectively levied antidumping duties for an additional 90 days, that is, for imports on and after February 10, 2001. For the other respondents, antidumping duties were levied for imports on and after May 11, 2001, the date of the initial Preliminary Determination.

The Court of International Trade, after a remand to Commerce to check certain of the data from India, affirmed the critical circumstances ruling. The respondents had argued that they should not be found to be dumping because their prices were in compliance with those set under the Suspension Agreement. They pointed out that the Suspension Agreement was in effect during the Period of Investigation of surrogate data for India. However, the court held that Commerce was not required to consider the price and volume terms or even the existence of the Suspension Agreement, stating that "the Suspension Agreement was not an agreement to eliminate dumping, but rather an agreement to restrict the volume of imports." Zhejiang, 25 ITRD (BNA) at 2409 n.34. The court held that it was not relevant whether the import price met the 92% reference price as applied during the period of the Suspension Agreement, and concluded that compliance with the reference price did not mean that dumping was avoided. Thus the court held that knowledge was properly imputed that the price of the honey from China was at less than fair value, despite the fact that the honey was not sold below the reference price of 92% of the average price of all imported honey.

Zhejiang challenges the imposition of "critical circumstances" based on this imputation of knowledge of sales at less than fair value. Zhejiang states that the purpose

and effect of the Suspension Agreement was to set "completely" a non-dumping price for Chinese honey, see 19 U.S.C. §1673c(b), and that the importers should not be charged with imputed knowledge that the China prices would be found to be below fair value when compared with later-determined costs and prices in India. Zhejiang argues that because the honey from China met the 92% price condition set in the Suspension Agreement, even after expiration of the Suspension Agreement, the importers should not, in fairness, be charged a retrospective penalty based on an unknown surrogate value of honey in India.

Zhejiang points out that the Suspension Agreement was designed to eliminate dumping, and disputes the government's position and the court's holding that the purpose of such agreements is not to prevent sales at less than fair value. The government cites a subsection of the statute that refers to suspension agreements with a nonmarket economy:

> 19 U.S.C. §1673c(l)(1). The administering authority may suspend an investigation under this part upon acceptance of an agreement with a nonmarket economy country to restrict the volume of imports into the United States of the merchandise under investigation only if the administering authority determines that --
> (A) such agreement satisfies the requirements of subsection (d) of this section, and
> (B) will prevent the suppression or undercutting of price levels of domestic products by imports of the merchandise under investigation.

This subsection, recognizing that value levels may not be comparable for a nonmarket economy, requires that a suspension agreement that restricts the volume of imports will not be entered unless the restriction will prevent suppression or undercutting of domestic prices. However, the statute does not mean or imply that dumping prices are intended to be acceptable, for §1673c(b) mandates that such agreements will "eliminate completely sales at less than fair value."

The government does not argue that the Suspension Agreement failed to comply with the statute. Rather, the government argues that Zhejiang was properly imputed with knowledge that prices that conformed with the Agreement were dumping prices. That position is negated by the statute itself, for the prices in compliance with the Suspension Agreement were required to be at a level that would eliminate sales at less than fair value. See United States v. Morton, 467 U.S. 822, 828 (1984) (parts of statutes are not construed in isolation; a statute is read as a whole). The Court of International Trade erred in holding that the Suspension Agreement was not designed to eliminate dumping.

Imputed knowledge of both unfair pricing and material injury should not be automatic. Such a determination is made "on a case by case basis," as the International Trade Administration of the Department of Commerce explained with respect to imputing knowledge of values in a market economy:

> . . . in our analysis of the "knowledge of sales at less than fair value" issue in state-controlled economy investigations, we must develop tests for determining whether the importers had, or should have had, knowledge of sales at less than fair value which are not dependent upon specific actual or implied knowledge of which country would be chosen as a surrogate for determining fair value.
> We must make the required determination on a case by case basis using all the available information and drawing upon market conditions of the industry subject to the investigation.

Final Determination of Sales at Less Than Fair Value: Potassium Permanganate From the People's Republic of China, 48 Fed. Reg. 57347, 57349 (Dec. 29, 1983), upheld by ICC Industries, Inc. v. United States, 812 F.2d 694 (Fed. Cir. 1987). This court sustained the imputation of knowledge that potassium permanganate prices were below fair value on the facts of that case, where there were only two originating sources of potassium permanganate in world commerce, and the product originating from China was priced

significantly lower than the product from Spain. Also, in ICC Industries there was not a non-dumping settlement at a specified reference price. These are all factors to be considered when deciding, on a case by case basis, whether there are critical circumstances warranting the enlarged retroactive imposition of dumping liability.

Zhejiang argues that the "knew or should have known" requirement for critical circumstances was not met, and that substantial evidence does not support the contrary finding based on imputation. We agree. As Zhejiang states, "it strains credibility to suggest that Commerce could establish minimum prices for honey designed to 'prevent the suppression or undercutting of price levels of the United States honey products' and then determine that U.S. importers purchasing honey in accordance with these pricing guidelines should have known these sales would be found to be at less than fair value." Reply Br. at 15-16. When all factors are considered, there is not substantial evidence to support the finding of critical circumstances.

The contrary ruling of the Court of International Trade is reversed. The case is remanded for appropriate further proceedings.

REVERSED AND REMANDED

05-1058                                    8